MASON v. ALEXANDER.

(Circuit Court of Appeals, Second Circuit. December 15, 1908.)

No. 48.

JOINT ADVENTURES (§ 4*)—ACCOUNTING—PROFITS.

Defendant, having a concession for a Mexican railroad, assigned the same to a trust company under an agreement for advances of funds to construct the road, etc. Plaintiff claiming an interest in the concession, it was agreed that defendant should pay him four-ninths of such part of the net profits accruing from defendant's contracts with reference to the road as defendant might retain for his own use and benefit. Thereafter defendant was discharged from further construction of the railroad and from liability to the trust company. It was then ascertained that the trust company had advanced to him for construction $216,031.64 more than he had disbursed. Defendant never completed his contract with the railroad company, nor had plaintiff and defendant ever settled an account between themselves. *Held*, that defendant's saving on the construction did not constitute net profits, in which plaintiff was entitled to share.

[Ed. Note.—For other cases, see Joint Adventures, Dec. Dig. § 4.*]

In Error to the Circuit Court of the United States for the Southern District of New York.

Graham Sumner, for plaintiff in error.

J. S. Wise, for defendant in error.

Before LACOMBE, COXE, and WARD, Circuit Judges.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

WARD, Circuit Judge. This is a writ of error to a judgment on the verdict of a jury for $118,292.84 in favor of the plaintiff below, defendant in error. The transactions out of which the claim arose are very complicated, and are as follows:

In January, 1898, defendant, Mason, offered to assign a concession (for which he was negotiating) for the construction and operation of a railroad in Mexico to a railroad company to be organized, and to transfer to the Maryland Trust Company the right to receive subsidy bonds to be given by the Mexican government, 15 per cent. of their proceeds to be applied to the repayment of a loan to Mason of $75,000 to be made by the trust company and its associates, the balance to be paid into the treasury of the railroad company, Mason to give the trust company, as agents for the lenders, the note of the contracting company to be organized to his order and indorsed by him for $75,000, with all of the capital stock of the railroad company except shares to qualify directors, as collateral, and $75,000 of the first of the 5 per cent. American gold bonds issued as a bonus. On the same day this offer was accepted by the Maryland Trust Company and 10 associates.

April 29, 1898, Mason entered into a contract with the Vera Cruz & Pacific Railroad Company, whereby he agreed to assign the concession to construct and operate the road, dated February 28, 1898, to the railroad company for $2,499,500, and to construct the road for $2,500,000 of the company's notes and $500,000 of 5 per cent. American gold bonds secured by mortgage to the Maryland Trust Company as trustee on the railroad company's property, excepting the right to receive the subsidy bonds which the railroad company was to assign to the trust company, to be sold by it and the proceeds applied to the payment of the railroad company's note to Mason's order for $2,500,000.

May 3, 1898, disputes having arisen between Mason and Alexander, who claimed an interest in the concession, they executed a contract whereby Mason agreed, after reciting the contract with the railroad company and with the trust company, to pay Alexander "four-ninths of such part of the net profits accruing from said contracts as the said Mason may retain for his own use and benefit, which payment shall be made by the transfer and delivery of four-ninths of such net profits in the form in which they may be when ascertained by the discharge of all obligations entered into by the said Mason with the said Vera Cruz & Pacific Railroad Company and with others for account of the said enterprise; that is to say, in stock, bonds, or notes of said company, or in cash profits." Mason was authorized to change the contracts as he saw fit.

October 3, 1898, Mason entered into a contract with the trust company, whereby he pledged 24,995 shares of the railroad company's stock and the notes of the railroad company for $2,400,000 to his order and by him indorsed to secure payment of his note to the trust company for $250,000 for moneys to be advanced by the trust company to him for certain specified construction purposes at certain specified times.

April 11, 1901, Mason entered into a contract with the trust company whereby he agreed to make a new contract with the railroad company and in place of the securities held by the trust company as collateral

for his note of $250,000 to deliver $5,000,000 5 per cent. American gold bonds, $2,500,000 first preferred 5 per cent. cumulative stock, $2,500,000 second preferred 5 per cent. cumulative stock, and $5,000,-000 common stock.

April 12, 1901, Mason entered into a contract with the trust company whereby he agreed to deliver all the above securities absolutely to the trust company except $1,250,000 common stock, and the trust company agreed to release him of and from all indebtedness to it as well as to it and its associates under the syndicate agreement, and to sell the subsidy bonds or hypothecate them as collateral security for Mason's notes "for the purpose of realizing funds wherewith to fulfill his construction contract with the Vera Cruz & Pacific Railroad Company as originally entered into and as intended to be modified by the terms of the said agreement of April 11, 1901, the proceeds of such hypothecation or sale to be devoted to the construction and equipment of the balance of the line of the Vera Cruz & Pacific Railroad and its branches."

March 14, 1902, Mason entered into a contract with the trust company, whereby he agreed to transfer $1,250,000 of the common stock of the railroad company to the trust company, which agreed to hold the same with all other stocks and bonds of the railroad company in its possession, as security for the repayment pari passu of its claims and Mason's claims against the railroad company, after payment whereof 15 per cent. of any balance was to go to Mason and the rest to the trust company, the trust company to have the right to deliver to Alexander four-ninths of the $1,250,000 of the common stock as his share of the profits of constructing the railroad, provided he released Mason.

November 1, 1902, Mason was discharged from further construction of the railroad, which was still uncompleted.

June 24, 1903, Haskins & Sells, certified public accountants, submitted to the trust company a statement of the accounts of Mason with the Vera Cruz & Pacific Railroad Company to date.

October 19, 1903, Allan McLane was appointed receiver of the trust company in the case of Gittings and Others v. Maryland Trust Company in the circuit court No. 2 of Baltimore city.

April 22, 1904, Alexander entered into an agreement with the receiver of the trust company whereby he released all claim against the railroad company's stock and the receiver agreed to set up every claim which the trust company and the railroad company had against Mason against any claim of his under contract of March 14, 1902, to the sum of $55,000 and to any profits, and to pay whatever was thus extinguished to Alexander out of the proceeds of the sale of the railroad company's securities, and to assign to Alexander any claim the trust company or the railroad company might have against Mason as shown in Haskins & Sells' account.

May 31, 1904, Alexander began this action against Mason to recover four-ninths of the net profits collected by him. August 31, 1904, Mason petitioned to intervene in the suit of Gittings against the trust company and demanded an accounting as to the sale of the securities. January 7, 1905, an accounting was ordered as between Mason, the trust company, and the receiver.

On the trial of the action at bar Alexander offered in evidence Haskins & Sells' account, and testified that he and Mason had gone over it, that Mason had approved various items, and that it showed, as of April 12, 1901, that the Trust Company had advanced to Mason for construction $216,031.64 more than he had disbursed. From all liability for this sum the trust company had released Mason by the agreement of that date, and therefore Alexander claimed he was entitled to four-ninths of it as net profits in the hands of Mason. The trial judge held, as matter of law:

"That the construction contract under which Mason was operating until 1901 was by substantial agreement of the parties terminated on the 12th of April, 1901, and he thereafter was president of the railroad."

It is true that Mason was president of the railroad, but the agreement of April 12, 1901, expressly recognized that he was to fulfill his construction contract thereafter. The trust company continued to raise or advance funds, and he continued to construct until November 1, 1902, when the operation was taken out of his hands. The trial judge also charged the jury:

"For the purposes of this case, without going into the question of law which the gentleman representing the defendant has argued, I instruct you that that sum of $216,031.64 was profit in Mason's hands, if you believe that there was, as has been stated here, what was practically a settlement of accounts ratifying and ascertaining these figures between Alexander and Mason."

We discover no evidence whatever that Mason and Alexander had settled any account between themselves. In their examination of Haskins & Sells' account Alexander was representing the trust company, and the purpose of the examination was to state the account between Mason, the trust company, and its receiver, which had been ordered by the Maryland court. No admissions that Mason made as to items in this account would necessarily affect him in his relations with the railroad company or with Alexander. Nor do we think that the balance from which he was released by the trust company was net profits in Mason's hands. The net profits in which Alexander was entitled to share under the agreement of May 3, 1898, were such as Mason should receive upon the completion of the contract and the discharge of all his obligations to the railroad company and others for account of the enterprise. He never did complete the contract, and the profits he made could only be ascertained at the time he ceased to construct, viz., November 1, 1902.

Furthermore, there is nothing to show that his obligation to the railroad company and to others, such as subcontractors, for account of the enterprise, had been discharged. It is highly probable that there were no profits on the construction at all. Moreover, if his discharge from all liability down to April 12, 1901, was obtained by a trick to cover his own indebtedness to the trust company, as the trial judge intimated, then such saving cannot be regarded as net profits of construction, in which Alexander is entitled to share.

These errors were duly covered by exceptions properly assigned, and the judgment is therefore reversed.